Springer, J.,
with whom Steffen, C. J., agrees,
dissenting:
This is a domestic violence case. “Domestic violence is a major problem, both in Nevada and in the United States. Domestic violence is the most common but least reported crime in the United States.”[1] In this case a woman murdered her domestic partner.[2]
*1313 Early on in this dissent I want to make it very clear that this is not a case involving the so-called “battered-spouse syndrome.” The courts have shown a growing sympathy to subjects of serious and chronic abuse who in an uncontrolled moment take the lives of their abusers under circumstances in which self-defense would not ordinarily furnish an excuse. The battered-spouse syndrome offers the possibility of a special form of self-defense to victims of chronic abuse, but this defense was not pursued in this case, probably because Ms. Earl’s testimony indicated that she stabbed her boyfriend by accident rather than in defense of a deadly attack. According to Ms. Earl, “He ran into it (the kitchen knife)[3]; I didn’t mean to kill him.”
Ms. Earl and her now-dead domestic partner have a history of violence in their relationship.[4] On the day of the murder the couple was having an argument of some kind, during which Ms. Earl claims that the victim “started grabbing at me.” Ms. Earl was not in fear at the time. She did not think that the stabbing- *1314 victim was going to hit her or otherwise harm her. In fact, she was pointedly asked during trial if she had “stabbed him to keep him from hitting you?” She answered the specific question in the negative and testified: “No. I didn’t stab him to keep him from hitting me. I didn’t want to stab him at all.” It was, you see, all a big mistake. According to her testimony, Ms. Earl’s intention in flashing the knife at her victim was quite simple: The “only thing I wanted him to do is go away.” Unfortunately, during the time that she was flashing the knife at her boyfriend, he “ran into it” and killed himself.[5]
Ms. Earl luckily escaped a conviction of first-degree murder for intentionally killing her boyfriend. The jury convicted her of second-degree murder, an unintentional homicide based on “implied malice,” which does not require an intentional killing but, rather, killing under circumstances which “show an abandoned and malignant heart.” NRS 200.020.[6] The second-degree murder conviction is consistent with Ms. Earl’s testimony that she did not intend to stab her boyfriend. It also represents a recognition by the jury that Ms. Earl did not stab her boyfriend in an attempt to save her own life from a deadly attack by him. All in all, self-defense is entirely inconsistent with Ms. Earl’s version of the killing and has no part to play in this case. This being the case, I have a terribly hard time understanding why the majority justices would invalidate this murder conviction on the ground that the trial judge refused to instruct the jury that Ms. Earl had “no duty to retreat” when her boyfriend was “grabbing at” her and that she had the right to “stand her ground” and stab him to death.
A rule that allows a person to stab another because he or she is “grabbing at” that person is facially unsupportable; but I am *1315 even more troubled when I read the instruction which this court believes the trial court should have given the jury in this case. The majority says that Ms. Earl was entitled to an instruction telling the jury that she had the “right to stand his [sic] grounds (sic) and slay his [sic] adversary.” The majority qualifies to some degree this newly-installed right to kill people who “grab at” you when it adds that Ms. Earl must, at the time she stabbed her boyfriend, also have believed that her boyfriend was “about to kill her” (grab her to death?) or at least do her “serious bodily harm.” Because the trial judge refused to tell the jury about Ms. Earl’s supposed right to “slay her adversary” under the circumstances described by her in her testimony, this court has decided to nullify her murder conviction. I am simply at a loss of words to say any more about the majority decision on this subject, because if the incorrectness of the decision is not apparent to the reader by now, I am sure that nothing that I might say further would clarify the matter.
The majority has yet another reason for freeing this murderer. The prosecutor told the jury: “You can tell from her testimony that it is malarkey.” I stress the word “you” because the prosecutor was merely suggesting to the jury that it could very well conclude that Ms. Earl’s testimony was malarkey. The prosecutor did not say that he thought the testimony was malarkey, he just said that he thought the jury could “tell” that this was the case. Obviously there is no prosecutorial misconduct here, but defense counsel objected to this argument anyway. The trial judge properly ruled in favor of the prosecution and in doing so made the harmless aside that “malarkey” was a “good expression, amongst us Irish at least.” What can possibly be wrong with the judge having said this? I certainly cannot see anything even remotely wrong with the judge’s saying, in effect, that “malarkey” is an acceptable slang expression, understood by everyone to mean “incredible.”
Strangely, the majority thinks that the judge’s saying that malarkey was a good Irish expression might have led the jury to believe that the judge himself might have been harboring the thought that Ms. Earl’s testimony was malarkey. I do not understand why or how it could arrive at such a conclusion. Since I do not understand what the majority is getting at, I will not discuss this grounds for reversal any further. The other remarks of the trial judge upon which the majority relies in reversing this conviction certainly were not so prejudicial as to require this jury verdict to be set aside. If a court is going to grope for a reason for a desired result, it can always come up with something, as it has in this case. The trial in this case is close to being error-free, and *1316 I dissent from the judgment of this court reversing an eminently correct murder conviction.

 Domestic Violence: A Handbook for Victims and Professionals, Nevada Commission for Women, 1992.

 The majority opinion recounts some incidents of violence taken from the murderer’s testimony. The victim, of course, could not testify as to the mutuality of the couple’s violence because the victim was dead and could not testify concerning the murderer’s past violence. We do know that the victim has expressed his fear of the murderer to his mother, had told his mother that he thought Ms. Earl was “crazy” and that he feared “something was going to happen” to him.
Whatever might be the history of domestic violence in this case, the murderer has not made out a case for application of a “battered spouse” defense, that is to say, one in which a victim of chronic abuse asserts a defense based on fears generated by past abuse rather than on traditional self-defense, under which there must be an immediate threat of great danger. This is a run-of-the-mill self-defense case, in which the murderer’s defense suffers from her having testified that she was not afraid of her unarmed victim and that the stabbing was an accident. As pointed out in the text, her testimony that she was not in fear of harm when the victim “ran into” her kitchen knife removes this case from the self-defense realm. There is no basis at all, with or without the assistance of the “battered spouse” defense, for believing that at the time of the murder, the murderer was seeking “to protect” her own life or “believefd] that the assailant [was] about to kill her”; consequently, she was entitled to neither of the instructions referred to in the majority opinion. A defendant may be entitled to an instruction, as put by the majority, “no matter how weak or incredible the evidence is,” but there is not even any “weak” or “incredible” evidence in this case to support the requested instructions. Saying that this murder conviction should be overturned because the trial court refused to misinstruct the jury in the manner sought by the defendant does not present an acceptable reason for liberating this woman from the responsibility she must bear for murdering her boyfriend.

The medical examiner in this case testified that it might be “possible but highly improbable” for the stab wound (“about four to six inches” in depth) to have been self-inflicted.

Women commit one out of three domestic homicides. Uniform Crime Report, Bureau of Justice Statistics (1991). There are a number of studies that indicate, correctly or incorrectly, that women and men engage in violence in the home to a fairly equal degree. See, e.g., J. Frodi, J. McCaulay & P. R. Thome, Are Women Always Less Aggressive than Men? A Review of the Experimental Literature, Psychology Bulletin 634-660 (No. 4, 1977). Of every 100 families, 3.8 experience severe husband-to-wife violence, but even more, 4.5, experience severe wife-to-husband violence. M. A. Straus, R. J. Gelles, Suzanne K. Steinmetz, Behind Closed Doors: Violence in the American Family (1980). The number of violent acts by wives against husbands exceeds the number of violent acts by husbands against wives by 14 percent. M. A. Straus, Wife Beating: How Common and Why?, Victimology 443-58 (No. 2, 1977-1978). The rate of violence by husbands against wives is decreasing; while the rate of violence by wives against husbands is increasing. M. A. Straus & R. J. Gelles, Societal Change and Change in Family Violence From 1975 to 1985 as Revealed by Two National Surveys, Journal of Marriage and the Family (No. 48, 1986). These are some samples of the data on this subject.
Suzanne K. Steinmetz, Ph.D., professor of family studies at the University of Delaware, has written extensively on the subject, and she addresses the question as to why all of the attention is given to violence by men against women and virtually no attention to violence by women against men. Dr. Steinmetz puts it this way:
If violence against men is recognized in history, recognized by law, recognized by the comic strips, why has there been almost no attention given to this problem? There are several reasons. First . . . case material has been lacking for abused males. Second, selective inattention, both by the media and by the researchers has been an influence. ... It is not likely that feminist researchers and counselors will publicly acknowledge that males might also be victims.
Straus, Gelles, Steinmetz, supra.

Those who might be inclined to believe Ms. Earl’s testimony that the victim “lunged” at her outstretched knife-bearing hand and that he “ran into” the knife might also believe that he was committing suicide or, possibly, that he was trying to disarm her. Under either version there is no suggestion that the stabbing was anything other than an accidental misadventure. There is nothing here to suggest self-defense because Ms. Earl was not in fear, and nothing that the victim did was perceived by her as a threat of harm.

“ ‘[Ijmplied malice . . . does not relate to a deliberate, intentional killing, but is rather a mens rea inferred in law from the circumstances of the killing.’ ” McCurdy v. State, 107 Nev. 275, 278, 809 P.2d 1265, 1266 (1991) (quoting Keys v. State, 104 Nev. 736 , 740, 766 P.2d 270, 272 (1988)). Implied malice may be present in cases where there is a malignant disregard and recklessness concerning life and safety of another. Keys, 104 Nev. 736, 766 P.2d 270. Stabbing a person who is “grabbing at” the victim may have been seen by the jury in this case as a “recklessness concerning life and safety” and, thus, as evidencing “implied malice” and as supporting a second-degree murder conviction.